J-S51020-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MONTEZ BLACKMAN | : | |
| | : | |
| Appellant | : | No. 849 EDA 2017 |

Appeal from the Judgment of Sentence February 3, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008744-2015

BEFORE:  DUBOW, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY NICHOLS, J.:                **FILED OCTOBER 22, 2018**

Appellant Montez Blackman appeals from the judgment of sentence following his convictions for aggravated assault, firearms not to be carried without a license, and carrying firearms in public in Philadelphia.[1]  Appellant claims that there was insufficient evidence supporting his aggravated assault conviction.[2]  We affirm in part, vacate in part, and remand for the correction of a clerical error in the sentencing order.

The trial court set forth the facts of this case as follows:

At trial, the Commonwealth first presented the testimony of Daisy Batties.  Batties testified that, on the evening of July 12, 2015, she was inside her apartment located at 2620 Norris Court in Philadelphia along with her two young children, her boyfriend/her children's father, Mark Nkwocha, and Appellant.  Batties' children were upstairs sleeping in their bedroom, and Mr. Nkwocha was

---

[1] 18 Pa.C.S. §§ 2702(a)(1), 6106(a)(1), and 6108, respectively.

[2] Appellant is not appealing his violations to the Uniform Firearm Act (VUFA).

watching television in her bedroom; Appellant was sitting on her couch while she was cleaning up the downstairs. Batties testified that she knew Appellant from the neighborhood, and more specifically, as her supplier of narcotics (marijuana and Percocets), which she regularly purchased from him. On this particular day, Appellant had gotten kicked out of his girlfriend's house, so he asked Batties if he could spend the night at her apartment. Batties obliged "[b]ecause this is [Appellant] I'm talking about. Everybody is scared of him. I'm scared of him."

Batties testified that while he was sitting on her couch, Appellant continued to rant and rave about how "he's going to take over the projects, how he runs the projects, how he [is] the king of the projects [and] everyone [is] beneath him." Appellant "was just ongoing about him being on top." Batties knew, based on her own dealings with Appellant, that he was referring to his drug-dealing enterprise. As she put it quite plainly, "He's a drug dealer. He's -- he['s] got goons, a squad, his team." Batties also testified that while Appellant was sitting on her couch, he was brandishing a handgun, the butt of which she saw in plain view protruding from his waistband.

Batties testified that, at approximately 11:00 p.m., she was standing two feet from her side window when gunshots rang out, just outside her window, and into her home. When she heard the shots and saw the bright flashes so close, she immediately dropped down to the floor. Appellant then immediately fired three[3] shots back out the same window. As she described it, "After the shots [were] fired through the window, there were shots going out the window, like, boom, boom, boom." Batties testified that she was only five or six feet away from Appellant when he returned fire.

Following the shootout, Batties got up from the floor, hysterically crying. Appellant was gone and the front door was open. Her boyfriend, Mr. Nkwocha, came running down the steps, yelling "what is going on?" He tried to calm her down, and confirmed that their children, fortunately, were unharmed. When police

_____

[3] Ms. Batties testified that she first heard three shots coming from outside her apartment towards the inside. N.T., 11/16/16, at 35. She continued that she heard around seven shots from the inside to the outside of her apartment. *Id.* at 35-36. She explained that while she was not counting, it was "repeatedly" and "had been more than five." *Id.* at 36.

arrived shortly thereafter, Batties reported that "somebody shot through my window." Candidly, she testified that she did not immediately report Appellant's return fire because she was scared.

\* \* \*

[A].     The first time I'm, like, still hysterical at that time. So they asked, like, well, what was going on?  And they're checking all around the house and everything.  I'm like, well, somebody shot through my window.  I'm like, I never had this.  Of all the years of me having [public housing], I never had that.  No type of animosity with anybody.  I'm a peaceful person.  So that's what I initially told them.  But when the cop made me feel like comfortable whereas though, like, I'm here to help you ma'am.  You be honest with me, I can help you, so I'm like, well -- because I was scared.  I'm like, I don't know what's going to happen.  I see this everyday.  I don't know what's going to happen. **I'm like, well, okay, I know who did it, you know. Like, I know who did it, so I know who was in my house too and I know who did it, and I pointed the person -- I pointed the person out.**

Batties testified that Appellant then nonchalantly walked by her apartment within minutes of the incident, and she identified him to police.  Appellant was immediately apprehended and she positively identified him a second time.  Police then transported her and Mr. Nkwocha to the station for statements.

Philadelphia Housing Authority Police Officer Benjamin T. Romanowicz testified that, on July 12, 2015[,] at approximately 11:00 p.m., he was on routine patrol in the vicinity of 25th and Diamond Streets when he received a radio call for gunshots.  He and his partner, Officer (now Sergeant) Matthew Richardson, drove to 26th and Norris Streets, where they encountered a crowd of people; after obtaining further information, they proceeded to Batties' residence.  Officer Romanowicz testified that he observed five bullet holes in the side window of the residence.  He was then met at the front door by Batties and Mr. Nkwocha, both of whom appeared panicked.  They informed [Officer Romanowicz] that someone shot into their home.  Officer Romanowicz did not observe ballistic damage to the walls inside the apartment.  In plain view on the couch, he found a handgun magazine.  Mr. Nkwocha immediately states, "That's not mine."  The couple then

provided more information, including Appellant's involvement in the shootout. Within a few minutes, Appellant appeared outside the residence, and was positively identified by Batties.[fn5]

> [fn5] Officer Romanowicz also found one (1) nine-millimeter fired cartridge casing on the kitchen floor approximately 12 feet from the side window.

. . . Mr. Nkwocha testified that, on July 12, 2015[,] at approximately 10:40 p.m., he was upstairs in Batties' residence, tucking their children into bed. Before going upstairs, he saw Appellant -- who was "selling weed" to Batties -- sitting on the couch with the butt of [a] handgun protruding from his waistband. At approximately 11:00 p.m., he heard gunshots ring out. He ran downstairs and saw Batties on the floor and Appellant standing next to the couch, five or six feet from the window, with a gun in his hand. Mr. Nkwocha ran over to Batties and Appellant tucked the gun away and left the premises.

Mr. Nkwocha also testified that, after speaking with the responding officers, he saw Appellant walk by the residence with a large group of males, at which time he identified Appellant, stating, "The guy [is] right there." Additionally, Mr. Nkwocha testified that, just prior to being transported to the station for a detailed statement, one of Appellant's friends, "Shiz[,"4] pointed at Mr. Nkwocha with his fingers in the shape of a gun -- indicating to Mr. Nkwocha, "don't snitch or [you're] gonna get shot."

* * *

Philadelphia Police Detective Terrance Sweeney testified that, along with Detective Kevin Williams, he was assigned to investigate the subject shooting. Upon arrival at the exterior of the premises, Detective Sweeney observed numerous gunshot holes through a window. He and his partner entered the residence, where it appeared that the gunshots were consistent with having occurred from inside the property. One of the responding officers pointed him to a firearms magazine sitting on the sofa and to a fired cartridge casing lying on the kitchen floor. Detective Sweeney ordered the officers to secure the area (no one enter, no one leave), while he obtained a warrant to search the premises. Within two hours, he returned with a warrant and searched the entire residence. On a table beside the sofa, inside

---

4 The name of the individual referenced as "Shiz" is not in the certified record.

a black shoebox, he found two .38 caliber fired cartridge casings, five live .38 caliber rounds, and a prescription pill bottle bearing Appellant's name, "Blackman, Montez." Detective Sweeney did not find any other evidence, on either floor of the residence.

Finally, the Commonwealth rested its case with audio recordings and transcripts of prison phone calls made by Appellant, in which Appellant freely admits to the shooting, and indicates that he fired at an individual who was trying to kill him: either "[he] was gonna kill me . . . or I was gonna kill him."[5]

Trial Ct. Op., 8/16/17, at 2-6 (citations and some footnotes omitted, emphasis in original).

---

[5] The exhibits admitted at trial are contained in the certified record. Accordingly, we have the benefit of the transcript of the relevant July 16, 2015 prison phone conversation, which we have included below.

[Appellant]: Maybe I'll be blessed or something to come up out of this. I don't know. Everytime [sic] I come home. I do better man.

Woman: Right.

[Appellant]: Maybe I was gonna get kilt or something.

Woman: Don't say that.

[Appellant]: Nah but for real. Real talk Jamira maybe that boul was gonna kill me or something. I don't know. Nah mean. So this just sit me down you know get him out the way. Or I was gonna kill him.

Exhibits, 11/16/16, at C-18 (7/16/15) (internal quotation marks omitted). Further, the exhibits contain other prison phone conversations by Appellant where he appears to be discussing the day in question as well as the trial. *See id.* at C-18 (7/14/15) ("Yea just tell him to see if to try to get him to not come to court."); C-18 (7/14/15) ("[T]hey ain't even give me no preliminary hearing. . . . they ain't got no evidence."); C-18 (7/15/15) ("I was shooting out his house haha.").

On November 17, 2016, following two days of trial, a jury found Appellant guilty of the aforementioned offenses. On February 3, 2017, the trial court sentenced Appellant to ten to twenty years' incarceration for the aggravated assault conviction. Appellant received no further penalty for the VUFA convictions.[6] Appellant did not file a post-sentence motion.

On March 2, 2017, Appellant filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) statement. The trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

Appellant's sole question on appeal is: "Was the evidence insufficient to convict Appellant of Aggravated Assault, when the evidence showed that Appellant was shooting a firearm from inside a house at no apparent target, therefore making it impossible to prove that he intended to cause serious bodily injury?" Appellant's Brief at 3.

Appellant argues that for an aggravated assault conviction, there must be a victim or intended victim. *Id.* at 10. He claims that there was no evidence presented to support the Commonwealth's claim that Appellant was shooting at someone outside the apartment. *Id.* at 11. Appellant distinguishes *Commonwealth v. Lopez*, 654 A.2d 1150 (Pa. Super. 1995), cited by the trial court, in that there was substantial evidence in *Lopez* that the defendant intended to cause harm to a victim even though that victim was

---

[6] The trial court imposed an additional consecutive sentence of three to six years' incarceration for a violation of probation on a previous robbery conviction.

not in her residence when the defendant fired into it. *Id.* at 13 (citing *Lopez*, 654 A.2d at 1155). Appellant further contends that firing a weapon alone does not satisfy the *mens rea* necessary to prove intent to cause serious bodily injury. *Id.* at 13.

Appellant also argues that the prison phone call made by Appellant was too vague for the jury to determine that he was discussing the shooting at issue in this appeal. *Id.* at 15. He claims that although the transcript of this call was introduced into evidence at trial, there is no context in the call to determine if Appellant was talking about this specific incident. *Id.* The Commonwealth counters that Appellant's argument goes to the weight, rather than the sufficiency, of the evidence. Commonwealth's Brief at 14-15.

We apply the following standard when reviewing a sufficiency claim:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Palmer*, --- A.3d ----, 2018 WL 3121452, *2 (Pa.

Super.), *reargument denied* (Pa. 2018) (citation omitted).

Section 2702 of the Crimes Code provides that a person may be found guilty of aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1). Section 2301 defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. Moreover, "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." ***Commonwealth v. Matthew***, 909 A.2d 1254, 1257 (Pa. 2006) (citing 18 Pa.C.S. § 901(a)).

This Court's decisions in ***Lopez*** and ***Palmer*** provide guidance. In ***Lopez***, the defendant fired eight bullets at the front door of victim's property. ***Lopez***, 654 A.2d at 1152. Unknown to the defendant, the victim was not present at the time of the shooting. ***Id.*** We held that a defendant may be guilty of aggravated assault where he discharges a weapon into an empty residence "if he possesses the requisite intent to cause serious bodily injury or bodily injury via the use of a deadly weapon to another, even though it is impossible for that person to actually cause such injury." ***Id.*** We reasoned that the fact that it was impossible for the defendant to harm the victim because she was not in the residence was of no consequence. ***Id.*** at 1155.

The defendant's "state of mind, not [the victim]'s location, is the key to determining whether he committed aggravated assault upon her." *Id.* Where the fact-finder makes a determination that the defendant "believed that [the victim] was inside her residence, intended to seriously harm her or harm her with a deadly weapon, and attempted to do so by firing bullets through the front doors" then a conviction for aggravated assault is warranted. *Id.*

More recently, we decided *Palmer*, in which the defendant was "captured on surveillance video extending his arm in a position consistent with firing a gun." *Palmer*, 2018 WL 3121452, at *1. At the same time, a vehicle carrying three persons arrived at an intersection near where the defendant was aiming, and the driver was shot and injured. *Id.* Two other vehicles were also passing by at that time. *Id.* The police discovered ten fired cartridge casings from the defendant's location. *Id.* The Commonwealth charged defendant, in relevant part, with aggravated assault of the driver and of a John Doe. *Id.* The defendant claimed that there was insufficient evidence to sustain the aggravated assault conviction in regards to the John Doe.[7] *Id.* at *2. This Court disagreed.

We explained that although there was no readily identifiable victim at whom the defendant was shooting, a jury could determine that the defendant "fired into a crowd of people, and, in turn, possessed the specific intent to cause serious bodily injury to someone in that crowd." *Id.* at *5. "There is

---

[7] The defendant in *Palmer* did not contest the sufficiency of the evidence as to the driver of the vehicle. *Palmer*, 2018 WL 3121452, at *4.

no doubt that a readily[]identifiable victim is sufficient to sustain the convictions in these cases, but we are not of the view that it is a necessary component." *Id.* at *8 (citing *Matthew*, 909 A.2d at 1254 (applying totality of the circumstances to determine if actions constituted aggravated assault)).

That there was no readily identifiable victim at which the defendant was shooting was not decisive. *Id.* at *8-9. The evidence established that the defendant hoped or believed that he hit someone in the crowd. *Id.* at *9. In light of the fact that the defendant fired ten shots towards an intersection occupied by numerous people, a "jury was permitted to attach significance to the natural and probable outcome of that behavior when assessing intent." *Id.* at *9 (citing *Commonwealth v. Fry*, 491 A.2d 843, 844–45 (Pa. Super. 1985) ("A fact finder may find that a person intends the natural and probable consequences of his actions.")). Ultimately, we concluded that "[t]he jury could find under the totality of the circumstances that Appellant fired into the group of people with intent to inflict serious bodily injury upon someone within that group." *Id.* at *8 (citation omitted).

Here, the fact that there was no readily identifiable victim is not a necessary element of Appellant's conviction. *See id.* Therefore, we turn to the totality of the circumstances to determine if Appellant intended to cause serious bodily injury to another person. *See id.*; *Matthew*, 909 A.2d at 1258.

Ms. Batties testified that she was approximately two feet from the window when she heard three shots being fired just outside her window and into her home. N.T., 11/16/16, at 17. She testified that she saw "bright

lights," which caused her to drop immediately to the floor. *Id.* at 18. She further testified that immediately after she heard gunshots coming in, "there were shots going out the window." *Id.* at 18. She counted from five to seven shots going from inside of her apartment and out through the window. *Id.* at 35-36. She specifically stated that she saw Appellant shooting out through her window.[8] *Id.* at 19.

Moreover, the transcript of a prison phone conversation was admitted at trial. In that transcript, Appellant stated, "maybe that boul was gonna kill me or something. . . . Or I was gonna kill him." *See* Exhibit, 11/16/16, at C-18.

Accordingly, the evidence admitted at trial and the totality of the circumstances, considered in the light most favorable to the Commonwealth, established that Appellant believed there was somebody shooting from the outside of the apartment and that Appellant shot back with the intent of causing serious bodily injury to that person. *See Palmer* 2018 WL 3121452, at *2; *Matthew*, 909 A.2d at 1257. The fact that Appellant fired five to seven shots in response to the shots fired into the residence shows his intent to cause serious bodily injury. *See Palmer*, 2018 WL 3121452, at *8. That the Commonwealth did not establish the identity of the victim, or whether he was still standing outside the window, was not relevant to Appellant's "state of

---

[8] Appellant does not dispute on appeal that he was the shooter, and the evidence sufficiently supports that he was the person shooting from inside Ms. Batties' apartment. *See* N.T., 11/16/16, at 19, 36, 92.

mind" and the determination of his intent when he fired back at the alleged shooter. **See Lopez**, 654 A.2d at 1155; **see Fry**, 491 A.2d at 844–45 (stating that a jury could "find that a person intends the natural and probable consequences of his actions").

As for Appellant's remaining claim that the evidence was insufficient because his prison phone call was too vague to determine whether he was talking about this specific incident, we agree with the Commonwealth that this is a challenge to the weight of the evidence rather than the sufficiency. **See** Commonwealth's Brief at 14-15; **Palmer**, 2018 WL 3121452, at *2. Appellant, however, has waived any challenge to the weight of the evidence. **See** Pa.R.Crim.P. 607(A) ("A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial: (1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion."); **accord Commonwealth v. Kinney**, 157 A.3d 968, 972 (Pa. Super. 2017).

To the extent Appellant's claim properly challenges the sufficiency of the evidence, we conclude that viewing the evidence in the light most favorable to the Commonwealth, there is enough context in the phone call for a jury to determine that Appellant was talking about this specific incident. The shooting occurred on July 12, 2015, and the phone call took place on July 16, 2015, four days later. **See** Exhibit, 11/16/16, at C-18 (7/16/15). Further, in the days preceding the July 16, 2015 phone conversation, Appellant had engaged

in other phone calls where he had been discussing the night of the shooting and the trial. *See id.* at C-18 (7/14/15); C-18 (7/15/15).[9]

Finally, we note that the sentencing order incorrectly states that Appellant pled guilty. Because it is undisputed that Appellant was convicted following a jury trial, we remand for correction of this clerical error.

Judgment of sentence vacated in part. Case remanded for the trial court to correct the sentencing order to reflect that Appellant was found guilty. Judgment of sentence affirmed in all other respects. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/22/18

_____

[9] In any event, even without taking into consideration the prison phone call, we would conclude that the evidence taken as a whole sufficiently establishes that Appellant fired five to seven shots in response to the incoming shots with the intent to cause serious bodily injury to the person firing the incoming shots.